CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 2 6 2017

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

NORFOLK SOUTHERN RAILWAY )
COMPANY, )
             )
     Plaintiff, )
             )
v. )
             )
CITY OF ROANOKE, a Virginia municipality, )
             )
     Defendant, )
             )
and )
             )
CHESAPEAKE BAY FOUNDATION, )
             )
     Intervenor-Defendant. )

Civil Action No. 7:16CV00176

**MEMORANDUM OPINION**

Hon. Glen E. Conrad
Senior United States District Judge

Norfolk Southern Railway Company ("Norfolk Southern") filed this action against the City of Roanoke (the "City"), claiming that an assessment imposed pursuant to the City's stormwater utility ordinance is "another tax that discriminate[s] against a rail carrier," in violation of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act"), 49 U.S.C. § 11501(b)(4). After the action was filed, the Chesapeake Bay Foundation (the "Foundation") was permitted to intervene as a defendant. Following the completion of limited discovery, all three parties moved for summary judgment on the threshold issue of whether the utility charge is a "tax" for purposes of the 4-R Act. For the following reasons, the court concludes that the utility charge is a fee rather than a tax, and is therefore not actionable under the Act. Accordingly, the defendants are entitled to summary judgment

**Background**

I. **Statutory and Regulatory History**

Before delving into the factual background of this dispute, the court will summarize the statutory and regulatory context in which the facts developed.

The federal Clean Water Act ("CWA") was enacted in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C § 1251(1). In accordance with that objective, the CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger complies with certain enumerated sections of the Act. 33 U.S.C. § 1311(a). One of the enumerated provisions is Section 402, 33 U.S.C. § 1342, which establishes the National Pollution Discharge Elimination System ("NPDES") program, "[t]he cornerstone of the Clean Water Act's pollution control scheme." Natural Resources Defense Council, Inc. v. U.S. Envtl. Prot. Agency, 822 F.2d 104, 108 (D.C. Cir. 1987). The CWA allows the Environmental Protection Agency ("EPA"), or an EPA-approved state agency, to issue NPDES permits for the discharge of certain pollutants. See id. § 1342(a), (b). In Virginia, the NPDES program is administered by the Virginia Department of Environmental Quality ("DEQ").

The EPA has identified stormwater runoff as a significant source of water pollution. See, e.g., 40 C.F.R. § 122.30(c) ("Storm water runoff continues to harm the nation's waters. Runoff from lands modified by human activities can harm surface waters in several ways including by changing natural hydrologic patterns and by elevating pollutant concentrations and loadings. Storm water runoff may contain or mobilize high levels of contaminants, such as sediment, suspended solids, nutrients, heavy metals, pathogens, toxins, oxygen-demanding substances, and floatables."). Stormwater runoff is generated when rain or melting snow flows over land or

impervious surfaces, such as paved streets, parking lots, and building rooftops, and does not soak into the ground. See EPA, NPDES Stormwater Program, https://www.epa.gov/npdes/npdes-stormwater-program (last visited Dec. 18, 2017). In urban areas, stormwater runoff is commonly collected and transported through municipal separate storm sewer systems (MS4s), and then discharged into local bodies of water. See EPA, Stormwater Discharges from Municipal Sources, https://www.epa.gov/ npdes/stormwater-discharges-municipal-sources (last visited Dec. 18, 2017).

In 1987, Congress amended the CWA to require implementation, in two phases, of a comprehensive regulatory program to address municipal and industrial stormwater discharges. See 33 U.S.C. § 1342(p). Phase I of the program required NPDES permits for large discharge sources, including operators of MS4s serving populations of 100,000 or more. Id. § 1342(p)(2). Phase II required the EPA to "identify and address sources of pollution not covered by the Phase I Rule." Envtl. Def. Ctr., Inc. v. EPA, 344 F.3d 832, 842 (9th Cir. 2003).

In 1990, the EPA promulgated regulations establishing Phase I of the NPDES stormwater program, which sets forth permit application requirements for the large discharge sources included in the first phase. See 55 Fed. Reg. 47,990 (Nov. 16, 1990) (codified at 40 C.F.R. pts. 122-24). In December of 1999, the EPA promulgated the Phase II regulations. See 64 Fed. Reg. 68,722 (Dec. 8, 1999) (codified at 40 C.F.R. pts. 9, 122, 123, and 124). The second phase required operators of MS4s in urban areas with populations of less than 100,000 to obtain an NPDES permit for stormwater discharges. See 40 C.F.R. § 122.26(a)(9)(i). "This permitting mechanism is designed to prevent stormwater runoff from washing harmful pollutants into local surface waters." EPA, NPDES Stormwater Program, https://www.epa.gov/npdes/npdes-stormwater-program (last visited Dec. 18, 2017). Pursuant to the CWA, permits for discharges from MS4s must "prohibit non-stormwater discharges into the storm sewers" and "require controls to reduce the discharge of

3

pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] or the State determines appropriate for the control of such pollutants." 33 U.S.C. § 1342(p)(3).

In 1991, the Virginia General Assembly enacted Virginia Code § 15.1-292.4, which "authorized local governments to adopt stormwater control programs and to impose charges on property owners to finance the cost of the programs." Twietmeyer v. City of Hampton, 497 S.E.2d 858, 859 (Va. 1998). That statute, which is now codified at § 15.2-2114, provides that "[a]ny locality, by ordinance, may establish a utility or enact a system of charges to support a local stormwater management program consistent with [the Virginia Stormwater Management Act] or any other state or federal regulation governing stormwater management." Va. Code § 15.2-2114(A). Charges imposed pursuant to the statute must be "based upon an analysis that demonstrates the rational relationship between the amount charged and the services provided." Id. § 15.2-2114(B). Localities must also provide for full or partial waivers of charges to any property owner who installs, operates, and maintains a stormwater management facility that reduces stormwater flow or pollutant levels, or retains and treats stormwater on site in accordance with an approved stormwater management plan. Id. § 15.2-2114(D).

The statute further provides that income derived from stormwater management charges "shall be dedicated special revenue, may not exceed the actual costs incurred by a locality operating under the provisions of this section, and may be used only to pay or recover costs for the following":

> 1. The acquisition, as permitted by § 15.2-1800, of real and personal property, and interest therein, necessary to construct, operate and maintain stormwater control facilities;
>
> 2. The cost of administration of such programs;

4

3. Planning, design, engineering, construction, and debt retirement for new facilities and enlargement or improvement of existing facilities, including the enlargement or improvement of dams, levees, floodwalls, and pump stations, whether publicly or privately owned, that serve to control stormwater;

4. Facility operation and maintenance, including the maintenance of dams, levees, floodwalls, and pump stations, whether publicly or privately owned, that serve to control stormwater;

5. Monitoring of stormwater control devices and ambient water quality monitoring;

6. Contracts related to stormwater management, including contracts for the financing, construction, operation, or maintenance of stormwater management facilities, regardless of whether such facilities are located on public or private property and, in the case of private property locations, whether the contract is entered into pursuant to a stormwater management private property program under subsection J or otherwise; and

7. Other activities consistent with the state or federal regulations or permits governing stormwater management, including, but not limited to, public education, watershed planning, inspection and enforcement activities, and pollution prevention planning and implementation.

Id. § 15.2-2114(A).

## II.    The City's MS4

The City operates an MS4 that manages stormwater through a network of street drainage systems, catch basins, gutters, man-made channels, retention basins, storm drains, and other physical facilities that collect and divert stormwater. The stormwater collected and diverted by the MS4 ultimately discharges into the Roanoke River or one of its thirteen tributaries in the City. The City's MS4 is operated in accordance with a General Permit for the Discharge of Stormwater from Small Municipal Separate Storm Sewer Systems ("MS4 permit"), issued by DEQ. It is designated as a Phase II system, based on the City's population of less than 100,000 people.

5

Pursuant to its MS4 Permit, the City is required to implement a stormwater management program designed to (1) reduce the discharge of pollutants, (2) protect water quality, (3) ensure compliance with water quality standards, and (4) satisfy the appropriate water quality requirements of the CWA and its attendant regulations. MS4 Permit, Decl. of Dwayne R. D'Ardenne ("D'Ardenne Decl.") Ex. 1 at COR 01894, Docket No. 46-2. The City is also required to implement "minimum control measures" to reduce pollutants and protect water quality. Id. Additionally, the City's permit includes Total Maximum Daily Load ("TMDL") requirements, which impose a ceiling on pollutant loads carried to City surface waters, and require the City to reduce pollutant levels in those waters in order to meet the TDML criteria. Id. at COR 01885.

The City has implemented an MS4 Program Plan pursuant to the requirements of its MS Permit. The plan contains six, specific minimum control measures designed to reduce pollutants in the City's stormwater management system and its surface waters. The measures include public education and outreach on the impacts of stormwater, public participation and involvement, illicit discharge detection and elimination, construction site stormwater runoff control, post-construction stormwater management, and pollution prevention and good housekeeping for municipal operations. MS4 Program Plan, D'Ardenne Decl. Ex. 2 at COR 02102, Docket No. 46-3. The City has also implemented two TMDL Action Plans to comply with the TMDL requirements of its MS4 Permit. D'Ardenne Decl. ¶ 16. The pollutants targeted by the TMDL Action Plans are bacteria, sediment, and industrial pollutants known as "PCBs," or polychlorinated biphenyls. Id. ¶¶ 16, 81.

III.    **The Stormwater Utility Ordinance**

In November of 2013, the City Council enacted a stormwater utility ordinance ("Ordinance") that became effective July 1, 2014. As authorized by Virginia Code § 15.2-2114,

the Ordinance established a utility to support the City's stormwater management activities (the "Utility") and a system of stormwater utility charges to fund those activities.[1]  See Code of the City of Roanoke ("City Code") § 11.5-1 et seq.  Since July of 2014, the Utility has managed the City's MS4 and administered its MS4 permit.  Prior to the enactment of the Ordinance, the City's Department of Public Works and Department of Transportation provided stormwater management services that were funded by tax revenue in the City's general fund.  D'Ardenne Dep. 38-39, Docket No. 44-1.

In adopting the Ordinance, the City Council found that "an adequate, sustainable source of revenue for stormwater management activities is necessary to protect the general health, safety, and welfare of the residents of the city."  City Code § 11.5-2.  The City Council also found that "parcels . . . with higher amounts of impervious surfaces contribute greater amounts of stormwater and pollutants to the city's stormwater management system and that the owners of such parcels should carry a proportionate burden of the cost of such system."  Id.  Accordingly, the City Council determined that it would be in the "best interest of the public" to base the Utility Charge on a parcel's "impervious surface cover."  Id.

The Ordinance imposes the Utility Charge on all "improved parcels," Id. § 11.5-3(a), which include "any parcel regardless of zoning district, zoning classification, or land use that has two hundred fifty (250) or more square feet of impervious surface," Id. § 11.5-10(d). The term "impervious surface" is defined as "any area improved, graded, and/or surfaced with impervious material or resulting in impervious conditions."  Id. § 11.5-10(c).  Such "material or condition is present when the natural infiltration of water into the soil is significantly impeded or prevented." Id.  "Improved parcels" are subject to the Utility Charge regardless of whether they are exempt

---

[1] The Ordinance refers to the particular assessment at issue as a stormwater utility "fee."  However, because the issue presented is whether the assessment is a "fee" or a "tax," the court will refer to the assessment as the "Utility Charge."

7

from real estate taxes. Id. § 11.5-3(a). Approximately 86% of the parcels in the City have been deemed to be "improved parcels." D'Ardenne Dep. 52.

Consistent with Virginia Code § 15.2-2114(D), the Ordinance provides that owners of improved parcels may submit applications for credits against the Utility Charge imposed. See City Code § 11.5-7. Owners of improved parcels can obtain credits for conducting various stormwater management activities or best management practices ("BMPS") that control, reduce, and/or treat stormwater runoff from their properties. Id.; see also D'Ardenne Decl. ¶ 46 & Decl. Ex. 6. BMPs eligible for credits include bioretention facilities, vegetated swales, constructed wetlands, rain gardens, detention ponds, rain barrels, pervious concrete, pervious asphalt, and other features that reduce the quantity of stormwater runoff or improve the water quality of stormwater runoff. D'Ardenne Decl. ¶ 49.

The City's GIS Division is responsible for determining the amount of impervious area on each parcel. Id. at ¶ 57. The GIS Division calculates the Utility Charge imposed on each improved parcel by dividing the amount of impervious area by 500, and then multiplying that number by the billing rate approved by City Council for the particular year. See Storm Utility Fee and Credits, Property Calculations, https://www.roanokeva.gov/1843/Storm-Utility-Fee-and-Credits (last visited Dec. 18, 2017). The GIS Division then provides the calculated charge and any approved credit to the Commissioner of the Revenue, who enters the information into the City's billing system. D'Ardenne Decl. ¶ 57. The City Treasurer then bills the Utility Charge to owners of improved parcels in two installments. The Utility Charge is listed as a separate line item on real estate tax bills for improved parcels that are subject to real estate taxation. Owners of improved parcels exempt from real estate taxes receive a separate bill for the Utility Charge. Id. at ¶¶ 58-60.

The Ordinance authorizes owners of improved parcels to request that the Utility adjust or correct the Utility Charge applied to their properties. See City Code § 11.5-9. The Ordinance lists five grounds for adjustment: (1) an error was made regarding the square footage of impervious surface; (2) the parcel is exempt from the charge; (3) there was a mathematical error in the fee calculation; (4) the parcel owner invoiced was incorrectly identified; and (5) an approved credit was incorrectly applied. Id. The City Manager determines whether an adjustment is warranted. Id. If a parcel owner disagrees with the City Manager's decision, the aggrieved party may appeal the decision to the Circuit Court for the City of Roanoke. Id.

Pursuant to the Ordinance, all of the revenue generated from the Utility Charge is deposited into a stormwater utility enterprise fund. Id. § 11.5-5. The enterprise fund is separate and distinct from the City's general fund. In accordance with Virginia Code § 15.2-2114, the Ordinance provides that the enterprise fund "shall be used exclusively to pay or recover costs for the following":

> (a) The acquisition by gift, purchase, or condemnation, as authorized by law, of real and personal property, and interest therein, necessary to construct, operate, and maintain stormwater control facilities;
>
> (b) The cost of administration of such programs;
>
> (c) Planning, design, engineering, construction, and debt retirement for new facilities and enlargement or improvement of existing facilities, including the enlargement or improvement of dams, levees, floodwalls, and pump stations, whether publicly or privately owned, that serve to control stormwater;
>
> (d) Facility operation and maintenance, including the maintenance of dams, levees, floodwalls, and pump stations, whether publicly or privately owned, that serve to control stormwater;
>
> (e) Monitoring of stormwater control devices and ambient water quality monitoring; and

9

(f) Other activities consistent with the state or federal regulations or permits governing stormwater management, including, but not limited to, public education, watershed planning, inspection and enforcement activities, and pollution prevention planning and implementation.

Id.

The Commonwealth of Virginia has implemented a reporting system to ensure that revenue from stormwater charges implemented under Virginia Code § 15.1-2114 is used for the purposes listed in the statute. D'Ardenne Decl. ¶ 65. Accordingly, the Utility submits an annual report to the DEQ that explains the Utility's revenue, expenditures, and major programs funded by the Utility Charge. In the instant case, it is undisputed that the Utility has utilized all of the revenue generated by the charge for stormwater management. Indeed, the record reveals that the Utility's annual expenditures for maintaining the MS4, improving the system, and reducing pollutants in the system and the City's surface waters have "exceeded annual revenues" from the Utility Charge since the Utility was established. Id. ¶ 67.

IV.    **Norfolk Southern's Property**

Norfolk Southern owns approximately 758 acres of property in the City, making it one of the City's largest property owners. Parcel No. 9999999 (the "9 Parcel"), encompassing roughly 726 acres, is the most sizable of Norfolk Southern's holdings and one of the largest improved, industrial parcels in the City. For tax year 2017, Norfolk Southern was assessed a Utility Charge in the amount of $416,748.28 for that parcel. D'Ardenne Decl. Ex. 7, Docket No. 46-8.

The 9 Parcel includes industrial buildings, paved areas, and areas covered by railroad track, ballast, sub-ballast, and roadbed. Approximately 50.7% of the stormwater runoff from the 9 Parcel drains directly into the City's MS4, and approximately 49.3% of the runoff drains into surface waters subject to the water quality requirements of the City's MS4 Permit and TMDL Action Plan. D'Ardenne Dep. 79; see also D'Ardenne Decl. ¶ 17. According to Norfolk

Southern, a large portion of the stormwater runoff from its ballasted property flows into Lick Run, a tributary to the Roanoke River that was originally created by Norfolk Southern. See Decl. of Tyler Bius ¶ 3, Docket No. 44-2. Part of Lick Run contains a concrete channel that the City maintains as part of its MS4. D'Ardenne Dep. 14. Norfolk Southern owns the property on which the concrete channel was built. Id. at 40.

Norfolk Southern claims that its ballasted railroad property in the City, most of which is located on the 9 Parcel, is "just as pervious" as lawns. Compl. ¶ 9. Accordingly, Norfolk Southern contends that the portion of its property covered in ballast, or crushed stone, should be excluded from the calculation of the assessed Utility Charge. Representatives of Norfolk Southern "have met with Roanoke officials in an attempt to convince Roanoke officials that Norfolk Southern ballasted railroad property should be treated no differently than lawns in administering the storm water utility [charge]." Id. However, the City "persists in assessing, levying, and undertaking to collect a storm water utility [charge] on Norfolk Southern based upon square feet that includes all ballasted railroad property owned by it in Roanoke." Id.

### Procedural History

On April 12, 2016, Norfolk Southern filed the instant action against the City, claiming that the disparity in treatment between ballasted railroad property and lawns constitutes tax discrimination in violation of subsection (b)(4) of the 4-R Act, which prohibits the imposition of "another tax that discriminates against a rail carrier." 49 U.S.C. § 11501(b)(4). The City moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing, inter alia, that the Utility Charge imposed pursuant to the Ordinance is not a "tax" for purposes of the 4-R Act.

The court held a hearing on the City's motion on September 14, 2016. During the hearing, the parties agreed that the threshold and potentially dispositive issue in this case is whether the

11

Utility Charge is a "tax" actionable under § 11501(b)(4) or a non-actionable "fee." Because the resolution of this threshold question calls for a fact-specific inquiry, the court questioned whether it could be better answered on a more complete record. See, e.g., Cumberland Farms, Inc. v. Tax Assessor, 116 F.3d 943, 946 (1st Cir. 1997) (noting that the determination of whether a charge is a tax or a fee, for purposes of the Tax Injunction Act, "presents a question of law appropriate for resolution on a properly developed summary judgment record"). In response, both sides acknowledged that the court's review of relevant factors may benefit from factual development. Accordingly, the court permitted the parties to engage in discovery on the issue of whether the Utility Charge is a tax or a fee, and denied the City's motion to dismiss without prejudice to refiling as a motion for summary judgment.

In the meantime, the Foundation moved to intervene in the case and defend the assertion that Norfolk Southern's ballasted railroad surfaces are as pervious as lawns. On October 19, 2016, the court granted the Foundation's motion.

Following the completion of the limited discovery permitted by the court, the parties moved for summary judgment on the issue of whether the Utility Charge is a tax for purposes of the 4-R Act. The court held a hearing on the parties' motions on May 15, 2017. At the conclusion of the hearing, the court permitted the parties to file supplemental briefs in support of their respective positions. The matter is now ripe for review.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013); see

12

also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "When faced with cross-motions for summary judgment, [courts] consider each motion separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law." Bacon v. City of Richmond, 475 F.3d 633, 636-37 (4th Cir. 2007). "The court must deny [the] motions if it finds that there is a genuine dispute of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." Sky Angel U.S., LLC v. Discovery Commc'ns., LLC, 95 F. Supp. 3d 860, 869 (D. Md. 2015) (citation and internal quotation marks omitted).

## **Discussion**

Congress enacted the 4-R Act in part to "restore the financial stability of the railway system of the United States." 45 U.S.C. § 801(a). "In order to achieve this goal, Congress targeted state and local taxation schemes that discriminate against railroads." CSX Transp., Inc. v. S.C. Dep't of Revenue, 851 F.3d 320, 324 (4th Cir. 2017). The portion of the 4-R Act at issue here provides that a state and its subdivisions may not:

> (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
>
> (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
>
> (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
>
> (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

13

49 U.S.C. § 11501(b). In this case, Norfolk Southern claims that the Utility Charge is "another tax" within the meaning of subsection (b)(4).

Unfortunately, the 4-R Act "does not define the term 'tax,' nor does it offer any other guidance about what falls within its ambit." Kan. City S. Ry. v. Koeller, 653 F.3d 496, 505 (7th Cir. 2011) (citing CSX Transp., Inc. v. Alabama Dep't of Rev., 562 U.S. 277, 284 (2011)). Accordingly, the court must look to the ordinary meaning of the term. CSX, 562 U.S. at 284. In CSX, the Supreme Court explained that the phrase "another tax" is "best understood to . . . encompass any form of tax a State might impose, on any asset or transaction, except the taxes on property previously addressed in subsections (b)(1)-(3)." Id. Stated differently, the "phrase 'another tax' is a catch-all." Id.; see also Burlington N. R.R. v. City of Superior, 932 F.2d 1185, 1186 (7th Cir. 1991) ("Subsection (b)(4) is a catch-all designed to prevent the state from accomplishing the forbidden end of discriminating against railroads by substituting another type of tax. It could be an income tax, a gross-receipts tax, a use tax, an occupation tax . . . -- whatever.").

Viewing subsection (b)(4) as a catch-all provision, however, does not resolve the issue presented here. The court "must still distinguish between a 'tax' on one hand and a 'special assessment' or 'fee' on the other." Koeller, 653 F.3d at 505. This is because the 4-R Act only applies to the former. Id.; see also Chicago & N.W. Transp. Co. v. Webster Cty. Bd. of Supervisors, 71 F.3d 265, 266 (8th Cir. 1995) ("Because the board is not violating the 4-R Act if it is not taxing the railroad, our first inquiry must be whether imposing the costs . . . on the railroad constitutes a tax within the meaning of [the statute].").

In determining whether a challenged assessment is a tax actionable under subsection (b)(4) or a non-actionable fee, other courts have begun their analysis by considering the Head Money Cases decided by the Supreme Court over 100 years ago. See Koeller, 653 F.3d at 505; Webster

14

Cty., 71 F.3d at 265; Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n, 141 F.3d 88, 96 (3d Cir. 1998); Union Pacific R.R. Co. v. Pub. Util. Comm'n, 899 F.2d 854, 858 (9th Cir. 1988). In the Head Money Cases, the Court was presented with the question of whether a federal statute that required ship owners to pay fifty cents for every immigrant passenger entering a United States port violated Article I, § 8 of the Constitution, because the provision did not "provide for the common defence and general welfare of the United States" and was not "uniform throughout the United States." Head Money Cases (Edye v. Robertson), 112 U.S. 580, 589-90 (1884). The Court ultimately held that the assessment imposed pursuant to the statute was not a tax, and thus that Article I, § 8 was not implicated. Id. at 595-96. The Court emphasized that the revenue collected from the assessment did "not go to the general support of the government." Id. at 595. Instead, it was used solely to regulate immigration. Id. at 596.

Accordingly, the "Head Money Cases stand for the proposition that a government levy is a tax if it raises revenue to spend for the general public welfare." Webster Cty., 71 F.3d at 267. On the other hand, "[i]f regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax." South Carolina ex. rel. Tindal v. Block, 717 F.2d 874, 887 (4th Cir. 1983). For example, in Union Pacific, the United States Court of Appeals for the Ninth Circuit held that an Oregon levy imposed on railroads pursuant to a state statute was not a tax within the meaning of § 11503(b)(4), since the proceeds were used exclusively to defray the cost of regulating railroad operations, "rather than to raise general revenues." Union Pacific, 899 F.2d at 859; see also id. at 857 (emphasizing that the levy at issue "does not go into Oregon's general fund; it produces no revenues for the general expenses of government but is devoted exclusively to defraying the costs of the regulatory program itself"). Similarly, in Wheeling, the United States Court of Appeals for the Third Circuit held that an assessment for the construction and maintenance of a bridge was not a tax for purposes of § 11503(b)(4), since it did not contribute

15

to the general fund of the municipality or the state and was used exclusively to defray the costs of a particular project. Wheeling, 141 F.3d at 96-97. In contrast, the Seventh Circuit held in Koeller that an annual maintenance assessment imposed on all landowners by a drainage district was a tax for purposes of the 4-R Act, since the assessment raised "general revenues" for the "widely-dispersed, general 'work of the district,'" and the assessed landowners did not receive any particular benefit from the expenditures. Koeller, 653 F.3d at 506-07.

The tax-versus-fee issue often arises in federal cases involving the Tax Injunction Act, 28 U.S.C. § 1341. "These cases make a general distinction between broader-based taxes that sustain the essential flow of revenue to state (or local) government and fees that are connected to some regulatory scheme." Collins Holding Corp. v. Jasper Cty., 123 F.3d 797, 800 (4th Cir. 1997). As is true under the 4-R Act, "[t]axes fall within the scope of the Tax Injunction Act, but regulatory fees do not." Id. In determining whether an assessment is a tax or a fee for purposes of the Tax Injunction Act, the Fourth Circuit has applied the standard set forth in San Juan Cellular Telephone Co. v. Public Service Comm'n of Puerto Rico, 967 F.2d 683 (1st Cir. 1992). See id.; see also Genon Mid-Atlantic, 650 F.3d at 1026; Valero Terrestrial Corp. v. Caffrey, 205 F.3d 130, 134 (4th Cir. 2000). In that case, after surveying relevant case law, the First Circuit observed as follows:

> [Courts] have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.
>
> Courts facing cases that lie near the middle of this spectrum have tended (sometimes with minor differences reflecting the different statutes at issue) to emphasize the revenue's ultimate use, asking

16

whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays [an] agency's costs of regulation.

San Juan Cellular, 967 F.2d at 685 (citations omitted).

With these principles in mind, the court now turns to the issue of whether the Utility Charge imposed pursuant to the Ordinance is "another tax" under subsection (b)(4) of the 4-R Act. 49 U.S.C. § 11501(b)(4). This is admittedly a close question. Two federal courts have concluded that similar charges imposed by municipalities in Georgia are taxes for purposes of other constitutional or statutory provisions. See DeKalb County v. United States, 108 Fed. Cl. 681, 704 (2013) (holding that stormwater management charges assessed by DeKalb County are "impermissible taxes that may not be imposed on federal properties without the government's consent"); McLeod v. Columbia County, 254 F. Supp. 2d 1340, 1348 (S.D. Ga. 2003) (holding that a stormwater management charge imposed pursuant to a Columbia County ordinance is a tax for purposes of the Tax Injunction Act). More recently, however, the Middle District of Georgia reached the opposite conclusion, holding that a stormwater ordinance enacted by the Unified Government of Athens-Clarke County "imposes a user fee and not a tax for purposes of the Tax Injunction Act." Homewood Village, LLC v. Unified Government of Athens-Clarke Cty., 132 F. Supp. 3d 1376, 1378 (M.D. Ga. 2015).

After considering the relevant caselaw and the parties' arguments, this court concludes that the Utility Charge imposed pursuant to the Ordinance lies outside the scope of the 4-R Act. While the assessment bears some indicia of a tax, the court is convinced that those features do not render the Ordinance a tax provision. Instead, the court concludes, for the following reasons, that the Ordinance imposes a regulatory fee, rather than a tax, for purposes of the Act.

17

First, the record establishes that the Ordinance and the Utility Charge are part and parcel of a comprehensive statutory and regulatory scheme designed to manage stormwater and its negative effects. As indicated above, because stormwater is often heavily polluted, the CWA and its implementing regulations require certain MS4 operators, including the City, to obtain an NPDES permit before discharging stormwater into navigable waters. In accordance with the CWA and the permit issued by the DEQ, the City must employ measures designed to "reduce the discharge of pollutants to the maximum extent practicable," "protect water quality," and "ensure compliance with water quality standards" under the CWA and its attendant regulations. 33 U.S.C. § 1342(p)(3); D'Ardenne Decl. Ex. 1 at COR 01894. As authorized by Virginia Code § 15.2-2114, titled "Regulation of stormwater," the City Council established the Utility and the charge at issue to support the stormwater management efforts required under federal and state law. Thus, the Utility and the Utility Charge were created to "implement national and state policies," Sarasota Cty. v. Sarasota Church of Christ, Inc., 667 So. 2d 180, 185 (Fla. 1995), and to aid the City in complying with "federal and state mandates," Densmore v. Jefferson Cty., 813 So. 2d 844, 853 (Ala. 2001). The court agrees with the City that the statutory and regulatory foundations of the Utility Charge support the conclusion that the charge is a fee rather than a tax. See Densmore, 813 So. 2d at 854 (holding that a similar stormwater assessment was a "valid fee for the purpose of regulating storm-water discharge" and "not a tax designed to raise revenue").

Second, it is undisputed that all of the revenue generated by the Utility Charge is used to fund the Utility's stormwater management facilities, operations, and activities. Similar to the fees at issue in the Head Money Cases, Union Pacific, and Wheeling, the revenue from the Utility Charge is "dedicated special revenue," which must be used exclusively for stormwater management purposes, pursuant to both the Ordinance and Virginia Code § 15.2-2114(A). Thus, the Utility Charge is not a vehicle for raising general revenue that could be used for any variety of

18

government functions. Nor is any portion of the revenue raised by the Utility Charge placed in the City's general fund. Instead, as in the Head Money Cases and Union Pacific, the revenue from the Utility Charge is deposited into a restricted stormwater fund, and can be used only for stormwater management facilities, programs, and activities. The fact that the Utility Charge is tied directly to stormwater management and is not intended to raise general revenue supports the conclusion that the charge is a fee, rather than a tax. See Union Pacific, 899 F.2d at 857 (emphasizing that the levy at issue did not "go into Oregon's general fund" or produce "revenues for the general expenses of government," but was instead "devoted exclusively to defraying the costs of the regulatory program itself"). Indeed, the Supreme Court of Virginia has previously held that a similar stormwater management assessment is "a regulation, not a tax," since the assessment is "tied directly to the administration of stormwater management and is not meant to raise general revenue." Twietmeyer, 497 S.E.2d at 861.[2]

Third, the structure of the Utility Charge more closely resembles that of a fee as opposed to that of a tax. For instance, much like the stormwater charge in Homewood Village, the Utility Charge does not apply to every property in the City. Instead, it applies only to improved parcels, which have over 250 square feet of impervious surface, and the charge is calculated based on the amount of impervious surface on each parcel. Parcels without impervious surfaces are not subject to the Utility Charge; nor are parcels with minimal areas of impervious surface. Thus, unlike the maintenance assessment in Koeller, the Utility Charge is not a blanket assessment. Property owners do not pay the Utility Charge simply because they own property within the City limits. The court agrees with the City that this distinguishing factor also supports the conclusion that the

---

[2] The court recognizes that a state court's characterization of a charge as a tax or a fee is not dispositive of the threshold issue before the court. Nonetheless, "'[s]tate law determinations as to whether a fee is a tax may still be pertinent or instructive.'" Homewood Village, 132 F. Supp. 3d at 1381 (quoting McLeod, 254 F. Supp. 2d at 1345).

19

Utility Charge is a fee rather than a tax. See Homewood Village, 132 F. Supp. 3d at 1381 (finding that the inquiry as to who paid the assessment indicated that the stormwater ordinance imposed a fee, rather than a tax, since the assessment applied only to owners of developed property).

Moreover, the regulatory purposes served by the Utility Charge's structure counsel in favor of characterizing the charge as a fee. See San Juan Cellular, 967 F.2d at 685 (explaining that the "classic 'regulatory fee' . . . may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive"). The basis of the Utility Charge calculation creates an incentive for owners of improved parcels to minimize the impervious surface area on their properties: the less impervious surface area, the less a property owner pays. Thus, the structure of the Utility Charge discourages development practices that result in increased stormwater runoff. Cf. Genon Mid-Atlantic, 50 F.3d at 1025 (holding that a county carbon charge was a fee for purposes of the Tax Injunction Act because of its plainly regulatory purpose of discouraging greenhouse gas emissions).

In addition, the Ordinance encourages owners of improved parcels to implement stormwater management practices that further reduce runoff and pollutants. Property owners who develop and implement such practices can reduce their Utility Charge by as much as fifty percent. This system creates incentives for property owners to develop and implement stormwater management practices, and in turn, aids the Utility in regulating and improving stormwater runoff. See Unified Gov't of Athens-Clarke Cty. v. Homewood Village, LLC, 739 S.E.2d 316, 3138 (Ga. 2013) (concluding that the fact that a stormwater ordinance enabled property owners to reduce the amount of their stormwater charge by maintaining stormwater management systems "further underscore[d] the notion" that the ordinance at issue imposed "a fee and not a tax").

The court also concludes that there is a sufficient correlation between the Utility Charge and the stormwater management services provided by the Utility. See Folio v. City of Clarksburg, 134 F.3d 1211, 1217 (distinguishing taxes and fees and explaining that a "user fee . . . is a 'payment[] given in return for a government-provided benefit' and is tied in some fashion to the payor's use of the service'") (quoting United States v. City of Huntington, 999 F.2d 71, 74 (4th Cir. 1993)). As the City emphasizes in its supplemental memorandum, and as other courts have recognized, "[i]t is impractical -- if not impossible -- to measure the quantity of stormwater runoff managed by the Utility from each improved parcel and impose the Utility [Charge] according to that volume measurement." City's Supp'l Br. in Supp. of Mot. for Summ. J. 11, Docket No. 61; see also City of Gainesville v. State, 863 So. 2d 138, 147 (Fla. 2003) (observing that "stormwater runoff, like wastewater and solid waste -- and unlike potable water, gas and electricity -- cannot feasibly be metered") (emphasis in original). Accordingly, the City, like many other municipalities, uses the amount of impervious surface area as the basis for the Utility Charge. City Code § 11.5-2; see also City of Gainesville, 863 So. 2d at 142 (noting that "[t]he vast majority of stormwater utilities across the country establish their rate structures by measuring impervious area"). In light of the City Council's express finding that "parcels . . . with higher amounts of impervious surfaces contribute greater amounts of stormwater and pollutants to the city's stormwater management system," City Code § 11.5-2, the court is convinced that the City's method of calculating the Utility Charge is based upon an analysis that demonstrates a rational relationship between the amount charged and the services provided. See Va. Code § 15.2-2114(B); see also City of Gainesville, 863 So.2d at 147 (holding that the City "properly based its fee on the amount of impervious area on each property," where the City, acting within its legislative discretion, determined that the need for a stormwater management system was created by impervious area, which prevents rain from percolating into the ground); Church of Peace v.

21

City of Rock Island, 828 N.E.2d 1282, 1284 (Ill. App. Ct. 2005) (concluding that the record established "a direct and proportional relationship between imperviousness and storm water run-off, thus creating a rational relationship between the amount of the fee and the contribution of a parcel to the use of the storm water system").

In resolving the tax-versus-fee issue, the court is cognizant of the fact that Norfolk Southern believes that it has been overcharged for surfaces that are not impervious to stormwater. However, any alleged error in determining the area of impervious surface on a particular improved parcel can be addressed in the adjustment, correction, and appeal process provided under the Ordinance.[3]   The possibility of such error in an individual case does not render the Utility Charge a tax for purposes of the 4-R Act.   See Homewood Village, 132 F. Supp. at 1376 (holding that a similar ordinance imposed a fee, rather than a tax, notwithstanding the plaintiff's argument that its property did "not even allow for any stormwater to run into the stormwater management system because of the manner in which its property drains"); see also Maine v. Department of Navy, 973 F.2d 1007, 1014 (1st Cir. 1992) (emphasizing that the law does not require a "precise correlation" between fees collected and services provided).

Finally, the court recognizes that all residents of the City of Roanoke benefit from the Utility's flood control and pollution control measures.   See, e.g., Koeller, 653 F.3d at 506 (observing that everyone in the district benefits by having fewer or less extreme floods); Valero Terrestrial Corp. v. Caffrey, 205 F.3d 130, 134-35 (4th Cir. 2000) (noting that it cannot be said that ensuring the environmental safety of the state's groundwater benefits a small section of society). Nonetheless, for the reasons discussed above, the court agrees with the City that the parcels

---

[3] The record is silent as to whether Norfolk Southern exhausted all of its administrative and judicial remedies after being assessed the Utility Charge for the 2017 tax year.  The court is satisfied from its review of the Ordinance that Norfolk Southern was not without a remedy for challenging any perceived error in the calculation of impervious surface area.  See City Code § 11.5-9.  If Norfolk Southern believes that it is being improperly charged for ballasted surfaces that are not impervious to stormwater, the company is entitled to pursue all remedies established at law, including an appeal to the Circuit Court for the City of Roanoke.  Id.

assessed a Utility Charge, including those owned by Norfolk Southern, "receive a special benefit from the funded stormwater services, which are designed to implement federal and state policies through the control and treatment of polluted stormwater contributed by those properties."[4] McLeod v. Columbia County, 599 S.E.2d 152, 245 (Ga. 2004) (citing Sarasota County v. Sarasota Church of Christ, 667 So. 2d 180, 184 (Fla. 1995)); see also City of Lewiston v. Gladu, 40 A.3d 964, 970 (Me. 2012) (explaining that developed properties "receive the special benefit of having their stormwater managed in an effort to comply with state and federal laws"). This factor, among others, distinguishes the assessment at issue here from those addressed in Koeller and Valero,[5] and further supports the court's conclusion that the Utility Charge is a fee, rather than a tax.

---

[4] Norfolk Southern devoted much of its initial briefing to the argument that it contributes to runoff abatement in a manner that other property owners do not, since much of the runoff from its ballasted property flows into Lick Run and the company still owns the property on which the tributary's concrete channel was built. This argument misses the mark. It is undisputed that the Utility is responsible for maintaining the channel and improving the quality of the water in the tributary and other surface waters in the City. Moreover, as another court recently explained, "the analysis of 'use' in regards to a statutorily authorized stormwater or sewer utility focus[es] on whether the ratepayer contributes to the need for and benefits from the utility, not whether the sewage or stormwater from a particular property travels through a particular pipe." City of Key West v. Key West Golf Club Homeowners', No. 3D13-57, No. 2017 Fla. App. LEXIS 7804, at *19 (Fla. Dist. Ct. App. May 31, 2017) (rejecting the plaintiffs' argument that a stormwater utility fee was illegal as applied to their properties). Here, the record establishes that the 9 Parcel generates and discharges stormwater runoff, and that the Utility manages and improves the runoff. Consequently, Norfolk Southern benefits from the existence of the Utility and the stormwater management services it provides. While the precise benefit may be difficult to measure, this difficulty does not make the Utility Charge a tax.

[5] In Valero, on which Norfolk Southern heavily relies, the Fourth Circuit held that a solid waste assessment imposed pursuant to West Virginia's Landfill Closure Act was a tax for purposes of the federal Tax Injunction Act. 205 F.3d at 136. The statute at issue imposed a charge of $3.50 per ton on all persons disposing of solid waste at any landfill in the state, and the charge was collected by the operator of the landfill and remitted to the tax commissioner. Id. at 132-33. The revenue generated from the charge was then funneled through the state treasury to particular landfills that did not meet criteria established by the EPA and whose owners did not have the financial resources to close them. Id. at 133; see also W. Va. Code § 22-16-1 (finding that "[t]here are numerous landfills throughout the State that must be closed because they cannot be operated in an environmentally sound manner," and that "[t]he permittees of many of the landfills that will be closing do not have the financial resources to close their landfills in a manner that is timely and environmentally sound"). Thus, the charge at issue in Valero did not function as a fee for the services provided by the landfill in which a payor's solid waste was disposed; nor could it be said that those responsible for paying the charge received a special benefit from the use of the revenue. Instead, they received the same general benefit as the community at large. Id. at 134-35. The court agrees with the City that Valero is distinguishable and does not control the resolution of this case.

23

## Conclusion

For the reasons set forth above, the court concludes that the Utility Charge at issue is a fee, rather than a tax, and is therefore not actionable under the 4-R Act. Accordingly, the court will grant the motions for summary judgment filed by the City and the Foundation. The motion for summary judgment filed by Norfolk Southern will be denied. Additionally, the City's renewed motion to dismiss under Rule 12(b)(6) will be dismissed as moot.

The Clerk is directed to send copies of this order to all counsel of record.

DATED: This 26th day of December, 2017.

_____
Senior United States District Judge

24